(May 29, 1975)

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v FLOYD GRAHAM, Appellant.—Judgment entered in the Supreme Court, Bronx County, on September 26, 1973, upon a jury verdict convicting the defendant of robbery in the first degree and possession of a weapon as a felony and imposing sentence, modified, on the law, to the extent of reversing the conviction and sentence upon the count charging possession of a weapon as a felony and dismissing said charge. As so modified the judgment is affirmed. The findings of fact implicit in the verdict of the jury are affirmed. The proof establishes that defendant used a gun to threaten and rob his victims. However, the possession of the weapon was merely incidental to and part of that crime—robbery in the first degree. The People concede and we find that the facts fail to show the commission by defendant of the separate crime of possessing the gun before or following the robbery. (People v Quick, 30 AD2d 561.) We are unanimous in finding that the case was properly submitted to the jury, but our two dissenting brethren are of the opinion that the verdict was coerced and that the prosecutor exceeded his proper role during summation and, for those reasons, they would reverse. We disagree. The jury did not deliberate two and one-half days and two nights. The actual deliberation time was about 20 hours during the elapsed two days and two nights. The trial court's urging to the jury was in no wise coercive. Its words were gentle and persuasive. The verdict was freely and intelligently arrived at. The court expressly cautioned the jury on more than one occasion that no juror should surrender a conscientiously held view unless properly convinced of errors and that no juror was to vote for any verdict except his own. That the jury acted deliberately and freely is amply established by their continuance of deliberation for almost three hours after the final supplementary instructions. The supplemental charge to encourage the jury to seek agreement after announcing a deadlock was proper. (Allen v United States, 164 US 492.) The Allen charge is approved in New York if not coercive. (People v Randall, 9 NY2d 413, 425; People v Albanese, 27 AD2d 820, revd on other grounds 19 NY2d 965.) We should not overturn the trial court on a discretionary ruling absent abuse, here completely lacking. Finally, we perceive no impropriety in the prosecutor's summation. In large measure he was replying to defense counsel's argument to the jury. This is permissible. (People v Castillo, 16 AD2d 235.) We have carefully reviewed the prosecutor's statements and find no prejudice. Defense counsel failed to object to any of the remarks or gestures complained of as prejudicial, rendering them unavailable as issues on appeal. (CPL 470.05; People v Fonseca, 36 NY2d 133; People v Vidal, 26 NY2d 249.) The father and daughter, victims of the robbery, positively identified the defendant as the individual who robbed them at gunpoint. Their testimony having been believed, the evidence of defendant's guilt was clear. He received a fair trial and the jury's verdict should be respected. Concur—Markewich, Kupferman and Nunez, JJ.; Stevens, P. J., and Murphy, J., dissent in the following memorandum by Murphy, J.: We vote to reverse the instant conviction and remand for a new trial. Nine days after a Bronx tavern owner claimed he had been robbed, at gunpoint, of cash and his pistol, two

police officers in a radio car observed a vehicle driven by defendant accelerate to go through an amber light. Although the car had not run a red light, they nevertheless decided to stop it for a license and registration check. According to the officer, defendant and his passenger looked behind them several times during the brief pursuit; and defendant's passenger disappeared from view briefly behind the front seat. When defendant admitted he had no driver's license and was then unable to give the name and address of his mother, the claimed registered owner of the car, he was arrested. The officer then reached under the passenger seat and withdrew a loaded .38 caliber pistol. At the stationhouse, the arresting officer checked the gun's number against certain records and ascertained that it had been reported stolen by the tavern owner in a numbered complaint filed with an adjacent precinct. The tavern owner was then requested to come to the stationhouse to identify his gun. On arrival he noticed defendant being fingerprinted and immediately identified him as the person who had robbed him. After a suppression hearing, the court declared the gun (and cash found on defendant) inadmissible at trial, but denied the motion to suppress the tavern owner's identification testimony. At the trial the tavern owner and his daughter, who witnessed the robbery, testified to the occurrence and both positively identified defendant as the perpetrator. The police officer testified to the events preceding the arrest. The only evidence introduced by defendant was a copy of a police form known as UF 61, which contained a detective's filed report of the robbery. The trial testimony was brief, involving only three witnesses. The jurors began their deliberations at 1:05 P.M. At 3:55 P.M. they requested a rereading of certain testimony and a copy of the UF 61 report. At 9:35 P.M. the foreman advised the court that "After long deliberation, the jury cannot reach a unanimous verdict." Without objection, the trial court then gave the jury a standard supplemental charge and urged it to continue in its attempt to reach a verdict. At 11:00 P.M. the jury was sent to a hotel for the night. The next day the jury deliberated until 4:45 P.M., when it requested a rereading of the entire testimony of the complainant and his daughter. Two hours later the foreman informed the court: "Each juror has thoroughly reviewed and presented his/her reason for the verdict on the counts given to the jury. These reasons have been presented and discussed many times. We reached the point in our deliberations where it was generally agreed that, 1) the jury could not reach a unanimous verdict. 2) We should hear the testimony of both Miss Jackson and Mr. Jackson to make sure that each of us had taken in everything into consideration with respect to each juror's position. After another complete review and discussion of each juror's reasons for his or her verdict, at this time we agree that, 1) Further discussion and review would not provide any further information which anyone of the jurors could possibly change his or her verdict on the counts given to us. 2) That we are still unable to agree unanimously on a verdict for the counts given to us." Over objection, the jury was sent to dinner and directed to continue deliberating thereafter. At 11:05 P.M. another mistrial motion was made and denied. Twenty minutes later, the jury was sent to a hotel. At 4:50 P.M. the following day, after requesting and receiving additional instructions, the jury found defendant guilty of robbery in the first degree and possession of a weapon as a felony. On this appeal defendant contends, inter alia, that all of the evidence adduced below was tainted by the illegal search and should have been suppressed; the verdict was coerced by the Trial Judge; and that he was deprived of a fair trial by reason of the prosecutor's misconduct. For the reasons stated below, we believe defendant is entitled to a new trial.

Although we agree with appellant that, in the circumstances presented, the gun was improperly seized *(People v Adams,* 32 NY2d 451; *People v Ingle,* 36 NY2d 413; *People v Bennett,* 47 AD2d 322), it does not necessarily follow that all evidence thereafter obtained is fatally infected. The question to be determined is not whether the evidence was obtained as a result of the primary illegality, but whether the police exploited it. *(Wong Sun v United States,* 371 US 471; *People v Fitzpatrick,* 32 NY2d 499.) In the instant case, it was wholly fortuitous that the tavern owner arrived at the precinct at the same time defendant was being fingerprinted in a nearby room. In sum, on the facts here presented, we would agree with the respondent that the connection between the lawless police conduct and the discovery of the challenged evidence had "become so attenuated as to dissipate the taint." *(Nardone v United States,* 308 US 338, 341.) However, we do find merit in the claim that the jury's verdict, reached after 2½ days and two nights of deliberation, was coerced. The jury declared itself deadlocked twice. The court's refusal to accept the first declaration, after seven hours of deliberation, was within the bounds of its discretion; the refusal to accept the second notification, after 14 hours of consultations, exceeded it. (CPL 310.60, subd 1, par [a]; Cf. *Matter of Bisceglia v County Ct. of County of Rensselaer,* 44 AD2d 619.) There were no complexities in this case. The only issue was identification. The jury's announced inability to agree was made after it had deliberated for an extensive period of time. Under the circumstances of this case, the court's refusal to accept the jury's second statement that agreement was unlikely was an abuse of discretion. Finally, since the only evidentiary link between defendant and armed robbery charged lay in the testimony of the tavern owner and his daughter, we believe the prosecutor exceeded his proper role during summation. The defense theory was an honest mistaken identification. The prosecutor countered by vouching for the credibility of his witnesses. As an example: "Juraud Jackson [the tavern owner] told you that he was a man who worked all his life and he worked for thirty years, thirty years with the Penn-Central Railroad. And what did he do in those years? He wasn't a bum. He didn't rob anybody. He saved his money. And what did he do with that money? He finally bought himself a business. He bought himself a tavern, Jack's Tap. He did something with himself. This isn't a bum off the street. This is a man who did something with his life. This is a man who can walk in front of any man and be proud. And this is a man whose word means something. And after thirty years on the railroad he bought that tavern and now he's been working for, what is it, nineteen years as a bartender. Did you ever meet a bartender who couldn't recognize people? Some of you go into bars. Did you ever meet a barkeep who didn't remember things? * * * Did you ever meet a man who worked on the railroad who didn't remember people? * * * And you are going to listen to the defense when they say he can't remember people? This man spends his entire life, he earns his money recognizing people. What kind of a man is Juraud Jackson? He is a man who works. He's a credit to the community. He's no robber. ' * * * And when Juraud Jackson tells you that that is the man who robbed him, don't have any doubt about it. Don't have any doubt about it at all. Juraud Jackson is not mistaken. He doesn't make mistakes like that. He couldn't be in the business he's in if he made mistakes like that. * * * And there is a difference between not being sure and knowing. Juraud Jackson, you know, there is a man who's licensed to carry a gun. Do any of you know how difficult it is to obtain a gun these days? It goes to, question of the man's character. These days it is so hard to get a gun that you can be sure that if the Police Department and the

authorities permitted that man to carry a gun, that he was a man who is worthy of the highest respect in the community; that he is a man who is worthy of your belief in every last instance. Juraud Jackson is not a man to be disbelieved. It comes back again and again and again to that point and I can't stress it enough." And with respect to Ms. Juraud: "But it isn't Juraud Jackson alone. There is another witness. Lisa Jackson. And what kind of person is she? Because she's put in doubt the same way. You know, she's on trial too. And Lisa Jackson is no bum either. Lisa Jackson is a gal who's going to college and helping her dad. * * * And when she sat there and she pointed out that man and she said, 'He's the one who pointed a gun at me and pointed a gun at my father.' Can you have any doubt that she was telling the truth? Not only it's the truth but it's right. He is the man who did it." And, finally, after overly dramatizing the case as essentially a contest between good and evil, the prosecutor concluded: "I want you to remember that Juraud Jackson deserves something from this community. He deserves the protection of the law. He deserves the right to be protected. He deserves to be shown that the jury system works and he deserves your careful consideration and your belief. Juraud Jackson deserves that. And that man [the defendant], he deserves nothing but a conviction, but a verdict of guilty because unless you completely disbelieve Juraud Jackson and his daughter, Lisa, unless you find that they are lying then you must return a verdict of guilty against that man." The jury's difficulty in resolving the simple issue presented has been detailed above. Under such circumstance, the clearly improper and prejudicial remarks by the prosecutor cannot be ignored. (Cf. *People v Lovello,* 1 NY2d 436; *People v Petrucelli,* 44 AD2d 58; *People v Rosado,* 43 AD2d 916.) Accordingly, the judgment appealed from should be reversed and a new trial ordered.